**CRAWFORD, County Treas., et al.
v. McCONNELL et al.**

No. 23304.   Sept. 17, 1935.

Lewis R. Morris, B. C. Logsdon, and Hayes, Richardson, Shartel, Gilliland & Jordan, for plaintiffs in error.

W. T. McConnell and Armstrong & Murphy, for defendants in error.

BUSBY, J.   This action was commenced in the district court of Oklahoma county on the 19th day of August, 1931, by D. T. McConnell, as plaintiff, against J. O. Crawford, county treasurer of Oklahoma county, Adelbert Brown, Brown & Stater, a copartnership composed of Adelbert Brown and Gordon Stater, and the City Audit Company, a corporation. The plaintiff sought an injunction to prevent the defendant county treasurer from paying to any or either of the other defendants in the action any sum or sums of money representing recoveries which might be obtained through judgments in certain designated tax protest suits then pending in the district court of Oklahoma county. Plaintiff also sought to enjoin the defendants other than the county treasurer from receiving any part or portion of the recoveries in such suits.

After issues had been joined the cause was tried to the court and resulted in a judgment in favor of the plaintiff. The defendants, with the exception of Gorden Stater, who disclaimed any interest in the controversy, have appealed to this court. They appear herein as plaintiffs in error. We shall refer to the parties in this opinion in the order of their appearance in the trial court.

The record discloses that on or about the 7th day of November, 1928, the plaintiff herein, Mr. D. T. McConnell, acquired from a Mr. Durham a business in Oklahoma City known and designated as the "Taxpayers Association," becoming the sole owner of such business. Plaintiff operated this business until on or about the 22nd day of June, 1929, when he disposed of the same in a manner which we shall subsequently describe. During the period of time which the so-called Taxpayers Association was being operated by Mr. McConnell, he made separate contracts with a large number of Oklahoma county taxpayers by the terms of which he was authorized to determine the legality of taxes assessed against the property and prepare and file with the county treasurer protest notices and protest taxes deemed by him to be illegal, and, in the event of necessity, employ attorneys to file suits for the recovery of illegal taxes. The contracts were drawn in the following form:

"To The Taxpayers Association,
    "323 First National Bank Building,
        "Oklahoma City, Oklahoma.

"The undersigned hereby employs the Taxpayers Association (a voluntary unincorporated association) to audit and investigate taxes assessed against the undersigned, to prepare protest notices covering any taxes deemed by said association to be illegal, and attach the same to the check of the undersigned for taxes, which check will be made payable to the county treasurer; to collect any illegal tax, and, if deemed by said association necessary or proper, to employ attorneys to bring suit for the undersigned for the recovery of any part of said taxes. And for any or all of the purposes for which said association is herein employed, the said association and D. T. McConnell of said association, are hereby severally constituted and appointed agents in fact of the undersigned, which ap-

pointment is coupled with an interest and is irrevocable.

"For the service above set out, which the association agrees faithfully to perform, the undersigned agrees to pay one-third of any amount of tax recovered, payable only when recovery and collection thereof is made."

The text of the foregoing contract indicates that the contemplated recoveries of alleged illegal taxes were such recoveries as might be had under the procedure outlined by section 12665, O. S. 1931. No mention is made of the possibility of recovery under Initiative Petition No. 100, which was adopted August 7, 1928. See sections 12305 to 12314, O. S. 1931, inclusive. It is to be observed from the suggestion contained in the above contract that the employment of attorneys to recover taxes paid under protest might or might not be necessary is somewhat misleading, since such recovery could only be procured through litigation. Section 12665, supra.

The plaintiff, who was not an attorney himself, first employed a Mr. Porter Morgan to conduct the necessary litigation. Later he employed the law firm of Brown & Stater, one of the defendants in this suit. The contract of employment whereby the last-mentioned law firm was retained was in writing under date of April 16, 1929. By the terms of the agreement the attorneys agreed to conduct the necessary litigation in consideration of the subsequent payment of 5 per cent. of the gross amount of any illegal taxes that might be recovered.

It appears that negotiations which resulted in this contract of employment were conducted between Mr. Adelbert Brown and Mr. McConnell and that the inducement which led Mr. McConnell to employ this particular firm of attorneys was that Mr. Brown agreed to loan to Mr. McConnell the necessary funds for financing the so-called business or enterprise known as the Taxpayers Association pending the ultimate determination of the litigation involved. It further appears that Mr. Brown actually furnished to Mr. McConnell for the purpose of conducting the Taxpayers Association during the period of time a sum slightly in excess of $9,000. A portion of this money seems to have been furnished to Mr. Brown by two other individuals whose names need not be mentioned in this opinion.

In accordance with the contract, suits were later filed in the district court of Oklahoma county to recover alleged illegal taxes which had previously been paid under protest. These cases were numbered 59501 to 59583, both inclusive, and 58901 to 59139, both inclusive. In each of these suits protesting taxpayers were plaintiffs and the county treasurer was defendant. These actions were pending at the time the case at bar was commenced, although it appears that while this case was being tried the trial judge assigned to hear and determine the above-mentioned tax protest cases announced his decision, whereby a portion of the alleged illegal taxes sought to be recovered was adjudged to be illegal and recovery was allowed for the same in favor of the taxpayer plaintiffs therein. Further reference to these suits will be deferred until we have completed our statement of facts concerning the activities and manipulations of the representative organization known as the Taxpayers Association.

It appears that in June, 1928, Mr. Brown proposed that Mr. McConnell sell to him the Taxpayers Association, or, in other words, sell him the interest of the Taxpayers Association in the suits about to be commenced or then pending. The deal was consummated and Mr. McConnell received a release from liability on the loans previously made to him and in addition thereto was to receive the sum of $4,000. A written contract of sale was made whereby the Taxpayers Association and its business consisting of the contracts which it had entered into with the taxpayers, was sold and assigned to Mr. Brown. However, the contract was made by Mr. Brown in the name of E. G. DeParade, a cousin of Mr. Brown's. Mr. Brown advised Mr. McConnell at the time that, since he was a lawyer and interested in the litigation or contemplated litigation being transferred, it would be illegal for him to conduct the transaction in his own name.

Later and on the 18th day of November, the business and properties of the Taxpayers Association, consisting largely of its interest in the pending litigation, were sold and assigned by written contract by Mr. E. G. DeParade to the defendant City Audit Company, a corporation, which was, in fact, the alter ego of Mr. Brown, who owned 97 of its 100 shares of stock.

The individual taxpayers who had entered into contracts with the plaintiff, McConnell, while he was operating the Taxpayers Association were not consulted as to their wishes in connection with any of the subsequent contracts above referred to. However, in the original contract of sale made by Mr. McConnell to Mr. DeParade it was stipulated

that Mr. McConnell was not "relieved of any obligations to such taxpayers under and pursuant to his authorization to represent them in securing the refunds of their taxes." The obvious purpose of the inclusion of this provision in the contract was to avoid the legal objection that the "debtor end" of a contract cannot be assigned without the consent of the obligee. The net and ultimate result of these various transactions was that after their consummation the firm of Brown & Stater nominally represented the various taxpayers in the tax protest suits by virtue of a previous contract of employment made with the former owner of the Taxpayers Association, Mr. McConnell, and Mr. Brown, the senior member of the law firm, was the asserted owner by purchase of a portion of the subject-matter of litigation, which interest was held in the name of his alter ego, the City Audit Company, a corporation.

It appears that Mr. Brown had formerly represented the Taxpayers Association when the same was owned and operated by one Mr. Durham. It also appears that Mr. Brown had successfully prosecuted a number of tax protest suits in the district court of Oklahoma county and recovered substantial judgments in connection therewith. On or about the 29th day of June, 1931, he procured the signature of one of the trial judges to a journal entry in a tax protest case arising prior to Mr. McConnell's connection with the Taxpayers Association which provided in part that he should be paid the sum of $9,795.66 out of the recovery as attorney's fee. Later in this same case this portion of the journal entry was declared to have been an error, and upon notice in supplementary proceedings it was corrected and Mr. Brown was ordered to pay back the $9,795.66. This suit was then filed by the plaintiff herein to prevent Mr. Brown or his corporation from obtaining possession of any of the money involved in the litigation pending which arose under the contracts executed between McConnell and the various taxpayers.

In the prosecution of this case plaintiff herein assumed the position that his attempted sale and conveyance of interest and contracts to the defendant Brown was illegal and void for the reason that an attorney cannot legally or ethically under the law of this state loan money to any person as a consideration or inducement towards causing such person to commit to him any evidence of debt or thing in action for collection (section 1691, C. O. S. 1921), and for the further reason that a practicing attorney cannot properly purchase a thing in action

with intent to bring suit thereon. (Section 1686, C. O. S. 1921.)

The learned trial judge in the case at bar held the attempted sale and assignment to be void and that the defendant Brown and his corporation, the City Audit Company, acquired no lawful interest under such illegal contract of sale. The defendants, plaintiffs in error who bring the case to this court for review, do not undertake to question the soundness of the trial court's ruling and decision on this particular question. They assert, however, that the contracts upon which plaintiff based his cause of action, namely, the contracts between him and the various taxpayers, were likewise illegal and void, and that the trial court committed error in granting relief at the instance of a plaintiff, whose only interest in the litigation arose out of and by virtue of the illegal contracts.

It is elementary and fundamental law that courts will not enforce or aid in the enforcement of a contract made in violation of law, and relief may properly be refused even though the invalidity of the contract is not set up as a defense. Hunt et al. v. W. T. Rawleigh Medical Co., 71 Okla. 193, 176 P. 410; 13 C. J. 492; Clark v. Utah Const. Co. (Idaho) 8 P. (2d) 454; Amarillo Oil Co. v. Ranch Creek Oil Co. (Tex. Civ App.) 271 S. W. 145. See, also, Murphy v. Garfield Oil Co., 98 Okla. 273, 225 P. 676. Nor can the plaintiff in an action prevail if, in order to recover, he is compelled to rely upon an illegal contract. 13 C. J. 502.

While the case at bar is not, strictly speaking, an action to enforce a contract, the only right of plaintiff, if any, in the controversy arises out of the various contracts of employment between himself and the protesting taxpayers. The judgment of the trial court does not approve his contract as legal nor adjudicate his right to receive compensation thereunder. It does, however, grant injunctive relief at his request and approves his asserted right to appear in court and seek that relief. The judgment, if allowed to stand, might become the instrumentality through which the plaintiff might come into possession of the proceeds of the tax protest suits, thereby placing him in a favorable position to collect the commissions referred to in his contracts with the taxpayers. The relief should not be granted at the plaintiff's request, nor should the indirect aid be extended to him by a court, unless the contracts from which his asserted right arises are legal. In order to establish any right to appear in this liti-

gation the plaintiff must and does resort to and rely solely upon his contracts. We therefore direct our attention to those contracts for the purpose of determining the legality thereof.

The contracts upon which the plaintiff relies are asserted to be illegal on the theory that by their context the plaintiff, though not an attorney, has bound himself to engage in the practice of law.

In this state, as elsewhere, the practice of law is governed by statute, and elaborate machinery has been established for the purpose of determining the qualifications of those who seek to serve the public in a professional capacity. The practice of law by one who has not established his qualifications in the manner prescribed by law is forbidden. Section 4087, C. O. S. 1921; section 4255, O. S. 1931. The ultimate and primary purpose of such statutes is to protect the public. They undertake to maintain a standard of qualifications for those who hold themselves out to advise or assist others in the protection and preservation of their legal rights. The execution of a contract which has for its purpose the performance of an act forbidden by law is illegal. Thus a layman cannot properly bind himself by contract to perform an act which can only be performed by a licensed attorney, nor can he obligate the other party to the contract to pay him compensation for the performance of such an act. 13 C. J. 424. The reports of decisions of courts of last resort of the various states contain many discussions of what constitutes and what does not constitute the practice of law. See People ex rel. Los Angeles Bar Ass'n v. California Protective Corporation (Cal.) 244 P. 1089; In re Otterness (Minn.) 232 N. W. 318; People ex rel. Illinois State Bar Ass'n v. Peoples Stock Yards State Bank (Ill.) 176 N. E. 901; People v. Alfani (N. Y.) 125 N. E. 671.

In the case of In re Eastern Idaho Loan & Trust Co., 288 P. 157, the Supreme Court of Idaho in deciding what constituted the practice of law used the following appropriate and comprehensive language which is peculiarly applicable to the case at bar:

"Such work as the mere clerical filling out of skeleton blanks or drawing instruments of generally recognized and stereotyped form effectuating the conveyance or encumbrance of property, such as a simple deed or mortgage not involving the determination of the legal effect of special facts and conditions, is generally regarded as the legitimate right of any layman. It involves nothing more or less than the clerical operations of the now almost obsolete scrivener. But, where an instrument is to be shaped from a mass of facts and conditions, the legal effect of which must be carefully determined by a mind trained in the existing laws in order to insure a specific result and guard against others, more than the knowledge of the layman is required; and a charge for such service brings it definitely within the term 'practice of law.'"

In the case at bar the plaintiff bound himself by the terms of the contracts entered into with the various taxpayers to determine and decide for them the legality of the various tax levies made against their property. There are few questions in law that are more difficult than the determination of what constitutes a legal tax. A large number of cases are contained in the reported decisions of this court in which the only questions involved were those relating to the legality of tax levies by the various municipalities of this state. Yet the plaintiff by the terms of his contract proposes to determine these intricate questions for and on behalf of the taxpayers with whom he has made contracts and to prepare for such taxpayers protest notices, and for this service he expects to receive a compensation in the form of a stipulated contingent commission. Clearly, we think this service should only be rendered to the public by one who has demonstrated his qualifications to advise on such matters in the manner required by law.

The preparation for a money consideration of legal instruments to be shaped from a mass of facts and conditions involving the application of intricate principles of law which can only be applied by a mind trained in existing laws in order to insure a specific result and to guard against other undesirable results comes within the term "practice of law."

It is especially important that advice of the character involved in this case should be given only by one whose mind is trained along legal lines when such advice is to be acted upon, for, when taxes are paid under protest as provided in section 12665, supra, the money representing the alleged illegal tax is impounded until the final determination of such suits as may be subsequently filed based upon the protest. Obviously, one not versed in or familiar with tax laws, if permitted to decide the course of action to be pursued in such matters, might tie up thousands of dollars in public funds on groundless protests thereby unjustly embarrassing the operation of municipal government.

Clearly, we think the plaintiff by his contract undertook to perform a type of service which could only properly be performed by one who had demonstrated his qualifications by obtaining a license to practice law.

Similarly, it is to be noticed that the plaintiff by his contracts undertook to employ attorneys **if necessary.** The necessity of such employment should have been apparent in view of the requirements of the law that suit be filed before the county treasurer is by statute authorized to return any of the alleged illegal taxes paid under protest. Section 12665, supra. Plaintiff must have known that the ultimate completion of his contract could only be accomplished by one licensed to practice law.

It follows from what we have said that plaintiffs asserted right to appeal for relief to a court of equity arises solely and exclusively out of an illegal contract and that by reason of the source of the asserted right relief should have been denied in the court below.

In holding that relief should be denied to the plaintiff, we do not in any way approve the contracts of Brown & Stater or of the City Audit Company, the corporation owned by Brown. Nor is this opinion to be taken as authority for the county treasurer to pay any of the other defendants in this suit any part or portion of such recovery as may have been obtained in the protest tax suit. We have carefully examined the record in this case and failed to find any indication that the county treasurer intended to do so regardless of what may have been the intention of the defendant Brown or of the City Audit Company with reference to obtaining a part of the recovery in those actions. It is true in this connection that the county treasurer did in another and different action involving 1924 protests issue a voucher to Adelbert Brown for a sum in excess of $9,000, but an examination of the record discloses that this was done only because the district court in its judgment in that case directed that such voucher be issued to Brown. We have no reason to apprehend that such an order will be made in the tax protest cases referred to herein. Indeed such an order cannot properly be made in those actions, unless individual notice be given to each of the individual tax protesting plaintiffs, since such an order would adjudicate a matter in which there is a possible adversity of interest between an attorney and client. See Board of County Commissioners of Okfuskee County v. Hazel-

wood, 79 Okla. 185, 192 P. 217, 11 A. L. R. 709, together with annotations in 11 A. L. R. beginning at page 713.

We are assuming that, unless some other legitimate and feasible means of distribution is devised, the money due each of the protesting taxpayers will be paid directly to them by the county treasurer, and if an attempt is made to disburse the money to some person not authorized by law by some legal contract to receive the same, the protesting taxpayers themselves may very properly institute such action as may be necessary and appropriate.

It incidentally appears from the record in this case that some attorneys not named in this opinion who represented clients having tax protest matters to be handled turned their cases over to the plaintiff. The contract and agreement between such attorneys and their clients are not presented to us in this action, and what we have said herein does not reflect in any way upon the legality of such contracts between attorney and client.

The judgment of the trial court is reversed, with directions to dismiss the action.

McNEILL, C. J., and RILEY, GIBSON, and CORN, JJ., concur.